RENAULT, INC., a corporation, Plaintiff,

v.

Preston M. MARBLE, Marie K. Marble, Thomas Edward Murray, Marlene A. Murray, Joseph C. Murray, William H. Taylor and Betty L. Taylor, Defendants.

Civ. A. No. 6771.

United States District Court
D. Colorado.

April 26, 1962.

Hodges, Silverstein, Hodges & Harrington, Attorneys at Law, Joseph G. Hodges, Denver, Colo., for plaintiff.

Alex Stephen Keller, Denver, Colo., for defendants.

DOYLE, District Judge.

The action herein is the aftermath of the sale by the defendants, Preston W. Marble, et al., of the corporate stock of Motor Imports Corporation, to the plaintiff, Renault, Inc., for a total purchase price of $120,000.00. Plaintiff seeks reimbursement for state and federal income taxes paid by the corporation soon after the sale. These taxes were for the fiscal year ending June 30, 1959; the stock was sold on June 9, 1959. Plaintiff claims that the defendants are liable for these taxes by reason of a warranty and indemnity agreement signed at the time of the closing whereby they agreed to indemnify plaintiff from loss resulting from a substantial difference between statements in the balance sheet and other closing papers, and the actual facts.

Renault, Inc. is a New York corporation which is affiliated with the French manufacturer of Renault automobiles. Motor Imports held an exclusive franchise as distributor of Renault automobiles in Colorado and Wyoming. Effective June 15, 1959, plaintiff purchased from the defendants 20,000 shares of capital stock of Motor Imports Corporation which was all of the outstanding stock of this company, for the sum of $120,000.00. The contract on which the action is predicated was executed on June 9, 1959, in connection with the close of the sale transaction and in it the individual defendants warranted that the balance sheet and other papers truly reflected the facts therein stated and the contract further provided that the defendants agreed to indemnify plaintiff "against loss and expense of every kind and description which said RENAULT, INC. and its nominee, if any, may incur by reason of any substantial difference between the representations herein made and the actual fact."

The significant documents which plaintiff maintains were misleading are the balance sheets dated March 31, 1959 and May 31, 1959. This latter was prepared about June 15, 1959. Nevertheless, defendants guaranteed the figures contained in it by reason of their warranty and indemnity agreement. The variance which plaintiff claims to have existed between the figures contained in the May 31st statement and the actual condition, consisted of omission of an estimated tax liability. The balance sheets were printed forms and one of the printed items was that of income tax liability (item No. 79 on the balance sheet). As of May 31, 1959, this item was left blank. Plaintiff claims, in essence, that this was misleading in that the consequences of failure to estimate taxes and to deduct estimated taxes from net profits before

taxes resulted in the balance sheets' reflecting a much more favorable total net worth than was actually justified. It is to be noted, however, that a net profit in the amount of $92,018.30 (item No. 78 on the balance sheet) was shown to be net profit or loss *before* income taxes. According to defendants, this income tax line was always left blank on intermediate balance sheets because the tax liability had not and would not mature until June 30, the end of the fiscal year.

It appears from the evidence that in May, 1959, Renault, Inc. was dissatisfied with the operation of the Motor Imports distributorship and a contingent of representatives came to Denver from New York on May 19, 1959, for the purpose of either drastically changing the method of operation or buying out the defendants' interest. Motor Imports had been quite profitable, averaging approximately $7,500.00 a month net profits before taxes. Nevertheless, Renault, Inc. was displeased with the operation and this stemmed from the fact that little effort had been made by Motor Imports to develop the territory. The dealerships were weak and Renault, Inc. was desirous of developing a mode of operation which tended more to promote their interests rather than large net profits to the distributor and so on May 19, Messrs. Velode, Vice President, Kent, General Sales Manager, and Dill, Regional Manager, came to Denver to confer with defendants. They first talked to defendant Preston Marble and tried to persuade him to buy out his partners and devote his full attention to the dealership (He had been spending part time only). He conferred with his associates, the other defendants, and later, on May 19, a conference was held between all of the defendants and representatives of Renault, Inc. and following this conference the defendants offered to sell the stock of Motor Imports to Renault, Inc. It is to be noted that Renault, Inc. had the right to cancel the franchise by giving ninety days' notice of intention to do so, and this fact was brought to the attention of Marble at the first conference.

The representatives of plaintiff examined a balance sheet dated March 31 in connection with the negotiations. This showed a total net worth of $95,000.00 including net profits as of March 31, 1959, of $75,000.00-plus. It was estimated that by the end of the year the net profits before taxes would amount to some $95,000.00 (using the analysis of the March 31 statement), and it was in relation to this fact that the sale price figure for the stock of $120,000.00 was arrived at. One of the four defendants stated at the time that he wished to have $30,000.00. At these discussions Kent, the General Sales Manager, pointed out that there had been a failure to show estimated taxes on the balance sheet and he criticized defendants for failing to do so. According to Kent, defendants played down this fact and said something like, "the taxes will be taken care of." Nevertheless, Kent admitted that he figured the taxes roughly and at that time fully realized that they would be in excess of $40,000.00 (which in fact they were when they were computed on June 30, 1959, after plaintiff had taken over the business).

It is to be clearly inferred from all the evidence that plaintiff's representatives had no quarrel whatsoever with the purchase price. Seemingly, they were so anxious to purchase this company and to gain control of it that they were willing, indeed eager, to pay this amount for it. There *was* discussion as to the amount of "blue sky" that they were purchasing, and they all testified that they were of the belief, following the conference, that they were getting $95,000.00 of solid assets and although plaintiff seeks to convey that positive representations were made by the defendants constituting a guarantee that the solid assets would approximate $95,000.00, the evidence fails to establish that any such unequivocal undertaking was given by defendants.

Following the May 19th conference, a further meeting was held on May 20 between the defendants and Mr. Lordeman, Fiscal Control head of plaintiff, and Mr.

Mignon, an assistant. They reported to Mr. Velode, who in turn cabled plaintiff's Paris office, setting out pertinent facts regarding the purchase of the distributorship and requesting approval of the sale. In this telegram Velode stated that the net assets at the end of March amounted to $75,000.00 and that as of June first would be approximately $90,-000.00. He mentioned other items, such as the potential sales figures and the fact that monthly profits before taxes would be $5,000.00, or $60,000.00, per year. Approval of the sale was transmitted to Velode by the Paris office on May 26, 1959. Thereafter, on May 31, Dill and one Challender, came to Denver and assumed practical control of the Motor Imports business.

On June 8, Lordeman and Mr. Hays, the attorney for the company, came to Denver for the consummation of the transaction. Hays testified that he was informed in New York that they were buying assets having a value of $95,000.-00 for the purchase price of $120,000.00.

At the closing, on June 9, the warranty and indemnity agreement referred to, was signed, together with a mutual release of all claims. The certificates were endorsed and the check for $120,000.00 was tendered and all the documents were placed in escrow pending plaintiff's verification of car inventory and obtaining of a signature of one of plaintiff's corporate officers on the mutual release so that sale was not completed until June 15. At about this time the accountant for Motor Imports completed the balance sheet of May 31st which showed a net profit as of that date (before taxes) of $92,018.30 and a total net worth of $112,-011.64. The accountant testified that plaintiff's representatives were in control of the business while this financial statement was being prepared and that she was under the supervision of Mr. Challender in preparing it. As in the past, the item of income taxes was left blank.

The defendant Joseph Murray, in his testimony admitted that income taxes were mentioned at the May 19 meeting, but he denied that he ever made the statement that these income taxes would be taken care of.

Apart from the claim for income taxes an additional item in the amount of $5,000.00-plus is demanded by plaintiff based upon alleged failure of Motor Imports to show liabilities in this amount. However, the evidence failed to establish this claim beyond the amount of permissible variation of $1,000.00 provided for in the warranty agreement. The testimony of defendants' accountant established to the satisfaction of the Court that these several items were in fact recorded.

There are several legal grounds for denying relief to the plaintiff:

*First*, it is important to note that this was a sale of corporate stock and in the absence of an express agreement to the contrary, the corporate entity would continue to be responsible for all of its obligations and thus the plaintiff has a particularly strong burden when it seeks to force the selling shareholders to personally assume this responsibility.

*Secondly,* the contract itself is vague and indefinite. Even giving to it full and liberal meaning, the best that can be concluded from the standpoint of the plaintiff is that this was a guarantee only with respect to the unknown, that which had not been specifically treated. It certainly does not undertake to provide a specific guarantee on the part of the defendants that no taxes are owing or that if such taxes should accrue in the future that the selling shareholders would assume responsibility for them. There was certainly every opportunity to impose such an obligation if the parties intended to do so. Their failure to specifically provide in the contract for this certain obligation would indicate that it was not intended to be covered. Nowadays, every transaction stands in the shadow of tax liability and it is inconceivable that the parties were not aware of this upcoming obligation and that they did not intend for the corporation to pay them.

There are some cases dealing with the problem of the seller's obligation to pay

taxes as part of a warranty to pay debts. Many of these are collected in an annotation reported at 4 A.L.R.(2d) 1314. Several of the cases collected in this note deal with the obligation of the buyer to pay the Government where he has undertaken to pay debts. See, for example, Helvering, Commissioner v. Wheeling Mold & Foundry Co., (4 Cir. 1934) 71 F. 2d 749. Where the tax has accrued there can be little question that it is a debt.

The cases cited by plaintiff, Yadusky v. Shugars, 306 Pa. 92, 159 A. 2; Verhagen v. Platt, 1 N.J. 85, 61 A.2d 892, 4 A.L.R.2d 1309, and Dingle v. Camp, (1922) 121 Wash. 393, 209 P. 853, differ from the case at bar in the respect noted above; that is, the tax liability *had accrued* as of the date of the sale. There are other differences; e. g., in the Yadusky case the undertaking to pay the taxes was more definite than in the case at bar. This was also true in the Verhagen case. There, the sellers agreed to pay all outstanding accounts, or bills, accruing up to a certain date. So also in Dingle, there is a guarantee that the liabilities did not exceed a stated sum.

Forest City Mfg. Co. v. Levy, (1931 Mo.App.) 33 S.W.2d 984, and In Re W. J. Marshall Company, (D.C.So.Dist.Ga.) 3 F.2d 192, are more comparable to the case at bar. The language and reasoning appearing in Forest City Mfg. Co., supra, is fully applicable. It was there said:

"* * * It is well to be reminded in this connection that this was not a sale by the corporation of its assets, nor was it a sale by the defendant of the assets of the corporation. The corporation did not sell its assets, nor did the defendant sell the assets of the corporation, but he sold the stock of the corporation. The benefit of the assets, it is true, inured to the purchasers of the stock, but subject to all the liabilities of the corporation, except such as were otherwise provided for by the contract. It does not appear that defendant got the benefit of the income during the period of a month and a half prior to February 13th. For .aught that appears either from the contract or the evidence, this income went to augment the assets of the corporation, the benefit of which inured to the purchasers of the stock. The income was the income of the corporation, not of the defendant as a stockholder. It was not unreasonable, but on the contrary it was most reasonable and natural, for the contracting parties to leave the income taxes for the tax year current at the time the contract was made to be paid by the purchasers or the corporation after the tax year had run, and the amount of the net income for the year, and the tax thereon, could be ascertained, especially since at the time the contract was made only a month and a half of the current tax year had run. But, whether reasonable or otherwise, it is manifest that the contract so provides."

In the case at bar there is nothing in the language of the warranty which indicates that it was intended to cover taxes which were to become due in the future.

*Thirdly*, the warranty itself was extremely weak: The balance sheet of March 31 which was part of the negotiations and which was relied on by the purchasers, did not assert that there was no tax liability and thus did not positively mislead. The particular item was left blank and the profit item immediately above this carefully described net profit as being *before* taxes. Thus, neither this balance sheet, nor the May 31st one was designed, nor was it capable of misleading. Moreover, the fact is that it did not mislead; Mr. Kent, in fact, testified that he noted that the balance sheet did not represent tax liability at all and that he commented on this fact and that he mentally calculated the tax at approximately fifty per cent. of the net profit.

▮ Normally, express warranty relates to matters which are beyond the knowledge of the purchaser. Thus, one who examines an article and relies on his own judgment will not be heard to

complain that it was false. Conceivably, there could be cases in which warranty would be nevertheless binding if it were, for example, an express and particular guarantee which this one is not. See 46 Am.Jur., 494–496, Sales, section 313, and the cases there cited. Here, however, the buyer not only made a full and complete investigation, but it is also shown to have operated the business during the period of time when the May 31st balance sheet was being completed. In the absence of a specific guarantee to pay taxes the Court would not be justified in implying such a guarantee in these circumstances. It is logical to believe, therefore, that the instant warranty was not intended to cover the tax liability in question by imposing a personal guarantee on these defendants.

*Fourthly,* the evidence fails to establish any specific parole undertaking to sell $95,000.00 of net worth and to guarantee any such figure. The most that can be said along this line is that the buyers apparently believed that they would get net worth in this amount, but there is a dearth of evidence to establish that defendants furnished them with a supplemental, oral promise or guarantee along this line. All of the parole evidence showing the prior, contemporaneous, and subsequent acts, conduct and statements of the parties was received and none of it succeeds in establishing a promise such as that which the defendants contend was made. The evidence certainly establishes that defendants expected to receive a net amount of $120,000.00. There was never any bargaining looking to their remitting the amount of the income taxes after the same became due. The subsequent demand by plaintiff appears to be afterthought. The only logical conclusion is that if plaintiff's belief did exist that it would receive a net worth of $95,000.00 this was a product of its own miscalculations, no doubt aided by the several contingents of representatives who participated in the negotiation and consummation of this sale.

Finally, the Court is of the opinion that neither the law, the facts, nor the equities favor the plaintiff in this case and that all of the issues, both factual and legal, must be resolved contrary to its contentions. It is, therefore,

ORDERED that judgment be entered in favor of the defendants and against the plaintiff.