317 F.2d 265
 RENAULT, INC., a corporation, Appellant,
v.
Preston M. MARBLE, Marie K. Marble, Thomas Edward Murray, Marlene A. Murray, Joseph C. Murray, William H. Taylor and Betty L. Taylor, Appellees.
 No. 7113.
 United States Court of Appeals Tenth Circuit.
 May 10, 1963.
 Rehearing Denied June 13, 1963.
 
 Joseph G. Hodges, Denver, Colo., of Hodges, Silverstein, Hodges & Harrington, (Thomas J. Kerwin, Denver, Colo., with him on the brief), for appellant.
 Alex Stephen Keller, Denver, Colo., for appellees.
 Before PICKETT and SETH, Circuit Judges, and CHRISTENSON, District Judge.
 PICKETT, Circuit Judge.
 
 
 1
 This action arose out of the sale of all of the capital stock of Motor Imports Corporation, a Colorado corporation, by the appellee-defendants (Marble Group) to the appellant-plaintiff, Renault, Inc. (Renault). Renault, in its complaint, alleges that the Marble Group agreed in writing to indemnify it against any loss or expense which might be incurred if a balance sheet of May 31, 1959 did not accurately reflect the financial condition of Motor Imports, Inc. on that date. It is further alleged that the balance sheet did not include as a liability of the corporation the current corporate income taxes of approximately $44,000 which were paid later by the corporation. The indemnity agreement made no specific reference to current income taxes, which had not accrued, and the issue presented is whether the agreement, as a matter of law, imposed a liability on the Marble Group for the amount of such taxes.[1] The trial court found that the parties had not, by the indemnity agreement, intended that the Marble Group, as individuals, should indemnify Renault for these taxes, and entered judgment for the defendants. Renault, Inc. v. Marble, D.Colo., 204 F.Supp. 453. We agree with this conclusion.
 
 
 2
 Under a distributor's franchise agreement dated December 4, 1958, Motor Imports Corporation, the wholesale distributor of Renault automobiles in Colorado and Wyoming, purchased automobiles, parts, and related equipment from Renault for resale to various dealers. In May, 1959, Renault was dissatisfied with this distributor, and it sent representatives to Denver for the purpose of exacting a change in the method of operation, acquiring the interests of the Marble Group, or terminating the dealership by the exercise of the 90 day termination provision in the franchise. After considerable negotiation, during which Renault examined a balance sheet showing the financial condition of Motor Imports Corporation as of March 31, 1959, Renault agreed to pay the Marble Group $120,000 for its stock.
 
 
 3
 On May 31, representatives of Renault took over, for all practical purposes, the operation of the distributorship. On June 8, Renault's attorney and another company official arrived in Denver for the purpose of closing the transaction. Renault's attorney prepared the indemnity agreement herein referred to, which contained this provision:
 
 
 4
 "Each of the documents and papers referred to and attached physically or by reference to Exhibit `A' which is attached to and forms part of this Warranty and Agreement of Indemnification reflects truly and accurately the facts therein stated. The undersigned, jointly and severally, hereby indemnify Renault, Inc. and its nominee, if any, against loss and expense of every kind and description which said Renault, Inc. and its nominee, if any, may incur by reason of any substantial difference between the representations herein made and the actual fact."
 
 
 5
 The "Exhibit `A'" referred to in the agreement was a financial statement or balance sheet, prepared on a printed form, showing assets and liabilities as of May 31, 1959. The space on the balance sheet for the inclusion of the current year's income taxes was left blank, and the net profit for the period covered was shown in the space designated in the attached profit and loss statement for reflecting net profit before income taxes. No entry was made in the space provided for net profit after income taxes. The papers required for the purchase were executed and deposited in a Denver bank pursuant to an escrow agreement, and on June 15 the parties directed the bank to deliver the stock and make the payments as directed in the escrow agreement. In connection with this final transaction the parties executed a mutual release.[2]
 
 
 6
 It is elementary that stockholders, as individuals, are not liable for the debts of the corporation. Liebhardt v. Wilson, 38 Colo. 1, 88 P. 173; Adams v. Clark, 36 Colo. 65, 85 P. 642; 13A Fletcher, Cyclopedia of Corporations § 6213 (1961); 18 C.J.S. Corporations § 580 (1939). The parties to the agreement were free to contract with respect to who should pay the current taxes or any part thereof,[3] and Renault's right to recover from the Marble Group is dependent upon the provisions of their agreement. There is no specific requirement in the protective agreement that the sellers should pay these taxes, nor is it clearly stated that they should be considered as a liability in the financial statement. At the time the agreement was made no part of the corporation's income taxes had accrued, and the tax liability at the end of the fiscal year could only be estimated. Under these circumstances evidence of the intent of the parties becomes material. In Chase v. Collins, 75 Colo. 156, 225 P. 255, the Supreme Court of Colorado said:
 
 
 7
 "In the construction of contracts it is elementary that the intent of the parties should govern, and any evidence showing such intent is highly important."
 
 
 8
 This language was quoted with approval in Hammond v. Caton, 121 Colo. 7, 212 P.2d 845. See also United States v. Essley, 10 Cir., 284 F.2d 518; Victory Inv. Corp. v. Muskogee Elec. Traction Co., 10 Cir., 150 F.2d 889, 161 A.L.R. 1436, cert. denied 326 U.S. 774, 66 S.Ct. 232, 90 L.Ed. 467; A. Leschen & Sons Rope Co. v. Mayflower Gold Mining & Reduction Co., 8 Cir., 173 F. 855; Uinta Tunnel, Min. & Transp. Co. v. Ajax Gold Min. Co., 8 Cir., 141 F. 563; Moore v. Second Congregational Church, 115 Colo. 392, 175 P.2d 90; Millage v. Churchill, 69 Colo. 457, 195 P. 107.
 
 
 9
 The trial court found that the parties did not intend that the income taxes for the current year were to be the responsibility of the Marble Group. Considering the record as a whole, including the conduct of the parties, there is no question that this conclusion is correct, and that this attempt to require such indemnification is an afterthought. Throughout the negotiations which resulted in Renault's purchase of the stock its representatives knew almost the exact amount of the corporate income taxes which would be due on the corporate profits as of the date the transaction was consummated. They knew that the corporation had made a substantial profit during the fiscal year which would end on June 30, 1959, and that corporate income taxes would be due for that year.[4] The May 31st balance sheet was prepared in June after Renault had taken over the operation of the business, and it knew then not only that the balance sheet reflected the financial condition of the corporation on May 31st without consideration of current corporate income taxes, but also the exact amount of the taxable profit as shown by the books on that date. Renault's failure to include the estimated income tax as a liability in the balance sheet could not have been an oversight.[5]
 
 
 10
 A few days later, when the bank was authorized to deliver the $120,000 to the Marble Group, Renault made no suggestion that an amount be withheld to take care of these taxes. Instead it executed a general release to the Marble Group of any and all liability to Renault. While we do not hold that this general release would relieve the Marble Group from any liability under the indemnity agreement, still, it is inconceivable that businessmen, knowing that the unaccrued current income taxes would be more than one-third of the purchase price, would authorize the payment of the entire purchase price, and execute a general release from liability to the sellers if it was intended that the sellers were to be responsible for those taxes when they became due.
 
 
 11
 Renault contends, however, that to reflect the true net worth of the corporation a balance sheet should show current income taxes. It argues that, under the provisions of the protective agreement, it is entitled to recover as a matter of law, without regard to knowledge or intent, because the failure to include such taxes makes this guaranteed balance sheet incorrect. We do not agree that the balance sheet is inaccurate as a matter of law, and the language of the agreement is not sufficiently precise to foreclose the trial court's determination of the intent of the parties.
 
 
 12
 Affirmed.
 
 
 
 Notes:
 
 
 [1]
 In its brief Renault says that, by the indemnity agreement, the Marble Group guaranteed the accuracy of the balance sheet as to minimum assets and maximum liabilities
 
 
 [2]
 This Release reads:
 "Know All Men By These Presents: That whereas Renault, Inc. or its nominee is on this date purchasing all of the capital stock of Motor Imports Corporation from Preston M. Marble, Joseph C. Murray, Thomas E. Murray and William H. Taylor for the total sum of One Hundred Twenty Thousand Dollars ($120,000.00); and,
 "Whereas, because of the said transaction all of the parties desire to mutually release each other from any and all claims and demands whatsoever,
 "In Consideration Of The Mutual Promises Hereinafter Contained, Renault, Inc. or its nominee, if any, Motor Imports Corporation, Preston M. Marble, Joseph C. Murray, Thomas E. Murray and William H. Taylor do by these presents mutually completely release and discharge each other from any and all claims and demands either in law or in equity which any of the parties may have against any of the other parties arising out of the operation of said Motor Imports Corporation.
 "Dated at Denver, Colorado, this 15th day of June, 1959."
 
 
 [3]
 It is not unusual for a sales contract to specifically provide that the seller shall pay a proportionate share of taxes for the current year
 
 
 [4]
 Jack C. Kent, an official of Renault, who took a leading part in negotiating the purchase of the stock, testified, in part, as follows:
 "Q. Did you discuss with Mr. Marble and his associates the amount of estimated Federal Income Tax at that point?
 "A. Yes, sir.
 "Q. And in what amount? A. It was estimated to be approximately, approximately fifty percent of the total earnings for the period of the statement.
 "Q. Was the figure $40,000.00 mentioned? A. I do not remember.
 "Q. Do you remember when your deposition was taken in January, 1961? A. I do.
 "Q. Did you remember at that time what the figure was estimated for income taxes? A. I do not remember if I remembered at that time. I remember it was approximately fifty percent of their earnings, so it would be about 40,000.
 "Q. To refresh your recollection, I call your attention to the bottom of Page 44 and the top of Page 45 of your deposition and ask if the following question and answer occurred:
 "`Q. Was the amount of that estimated tax figure mentioned or discussed at the meeting? A. I don't recall. At some time during the day the amount was discussed because I remember taking half of the — just as a broad estimate on what the Federal Income Taxes on a company this size would amount to and stating that the taxes would be approximately someplace in the vicinity of $40,000.00.' Do you remember that, sir?
 "A. I would like to read it, but I remember and my recollection is that the income tax would be approximately fifty percent of their earnings.
 "Q. Well, do you recall making this answer to my question?
 "A. Yes.
 "Q. And that is substantially what you said here in court, too, isn't it? A. May I read it? (pause) Yes, I guess it is. I would like to read * * *
 Mr. Hodges: I think you are reading from 44 and 45?
 Mr. Keller: Yes, the first answer on the top of Page 45.
 "A. * * * this; I said, `I don't recall.'
 "Q. At the end of the sentence? A. About $40,000.00?
 "Q. That is what you said then and that is what you say now, isn't it? A. Yes, sir.
 "Q. So the fact that the thing was left blank on the March statement, Defendant's Exhibit I, didn't fool or mislead you because you knew about what it would be, is that right? A. It didn't fool or mislead me. It was missing from the statement and this was brought out in the meeting and then we discussed the amount.
 "Q. So you weren't mislead by the lack of it on the statement were you? A. No.
 "Q. And you also knew at the time, did you not that since the taxes were due and unpaid, that that would reduce the net worth figure shown on the March statement? A. The net figure shown on the March statement was not correct in view of the taxes not being shown on it.
 "Q. And you knew that? A. Yes sir.
 "Q. And you discussed that in the presence of these four gentlemen, with your superior, Mr. Valode, did you not?
 "A. Yes, sir."
 
 
 [5]
 In referring to the omission, the trial court said: "Their failure to specifically provide in the contract for this certain obligation would indicate that it was not intended to be covered." Renault, Inc. v. Marble, D.Colo. 204 F.Supp. 453, 456